## HARTER *v.* KERNOCHAN.

1. A township in Illinois and a taxpayer thereof, on behalf of himself and other resident taxpayers, filed their bill in a court of that State against certain State, county, and township officers and the " unknown owners and holders " of certain township bonds, each payable in the sum of $1,000. The bill prayed for an injunction to restrain the levy and collection of a tax to pay the principal of the bonds or any interest thereon. A., a citizen of another State, was the owner of all of them. *Held,* that he was entitled, under the act of March 3, 1875, c. 137 (18 Stat., pt. 3, p. 470), to remove the suit to the Circuit Court of the United States.

2. A decree was rendered by the State court against A. by default, although he was not summoned, nor served with a copy of the bill or any notice of the pendency of the suit. On his application within the prescribed period the decree was set aside, and he thereupon filed his petition to remove the cause. *Held,* that it was filed in due time.

3. Neither the act of the legislature of Illinois, entitled " An Act to incorporate the Illinois Southeastern Railway Company," approved Feb. 25, 1867, authorizing townships to make donations to that company, nor the amendatory act of Feb. 24, 1869, authorizing the issue of township bonds, for the amount so donated, is in conflict with the Constitution of the State.

4. The bonds of the township of Harter, dated April 1, 1880, signed by the supervisor and countersigned by the clerk of the township, reciting that they are issued in pursuance of the authority conferred by those acts and an election of the legal voters of the township, held on the tenth day of November, 1868 under their provisions, are valid obligations of the township, although the donation was voted to the Illinois Southeastern Railway Company, and they were delivered to a corporation formed, pursuant to law, by the consolidation of that company with another.

5. As the records of the township show that the bonds were directed to be issued and delivered to the new company, the township is, as against a *bona fide* holder of them for value, estopped from denying their validity.

APPEAL from the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. W. J. Henry* for the appellant.
*Mr. George A. Sanders, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit involves the liability of the township of Harter, in the county of Clay, State of Illinois, upon certain bonds, signed by its supervisor, countersigned by its clerk, and issued, in its name, under date of April 1, 1870. They were each made payable in the sum of $1,000 to the Illinois Southeastern Railway Company or bearer, thirty years after date, with interest at the rate of ten per cent per annum; the right, however, being reserved to the township to make payment at any time after five years from date of issue. Each recites that it is one of a series " issued by said township to aid in the construction of the Illinois Southeastern Railway, in pursuance of the authority conferred by an act of the General Assembly of the State of Illinois, entitled ' An Act to incorporate the Illinois Southeastern Railway Company, approved Feb. 25, 1867,' and an act amendatory thereof, approved Feb. 24, 1869, and an election of the legal voters of the aforesaid township, held on the tenth day of November, 1868, under the provisions of said act." Upon each bond also appears the certificate of the State auditor, stating that it had been registered in his office, pursuant to the provisions of the act entitled " An Act to fund and provide for paying the railroad debts of counties, townships, cities, and towns," in force April 16, 1869.

The bill was filed in the year 1877, in the Circuit Court for Clay County, by the township of Harter and two of its resident taxpayers, — the latter suing in behalf of themselves and all other taxpayers of the township, — against the State treasurer and auditor, the county clerk and treasurer, the township collector, supervisor, and clerk, and two justices of the township; and also against the " unknown owners and holders " of such bonds with their coupons, who are alleged to be residents and citizens of States other than Illinois. It proceeded upon the ground that the bonds were issued without authority of law, and, consequently, were not binding upon the township. The prayer of the bill was that such a decree, with perpetual injunction, be rendered as would prevent the State, county, and town-

ship officers from taking any steps towards the assessment and collection of taxes to meet the bonds or any instalment of interest thereon; that the holders and owners of the bonds and coupons, their agents and attorneys, be required to bring the same into court for cancellation; and that the State and county treasurers be ordered to pay over to the township any money in their hands which had been raised by taxation for the payment of the bonds or their coupons. The officers who were sued, although duly served with process, made no defence. The unknown holders and owners of the bonds and coupons were proceeded against by publication in the manner authorized by the State law. A final decree was entered on the first day of May, 1879, giving relief to the full extent prayed for.

On the seventeenth day of April, 1880, Kernochan, the owner of all the bonds and coupons issued by the township, — having, it is conceded, acquired them before due, paying value therefor, and without notice of any defence except that appearing in the law and upon the face of the bonds themselves, — presented to the State court a petition stating that he had neither been summoned nor served with a copy of the bill, nor received any notice of the pendency of the suit. Upon that petition he based a motion to redocket the cause and open the decree, to the end that he might be heard touching the matters of such suit. His application was granted, and upon the same day he filed another petition, accompanied by a bond in the required form, asking the removal of the cause to the Circuit Court of the United States, upon the ground that the controversy was between citizens of different States, and that he was then, as well as at the commencement of the suit, a citizen of Massachusetts, while the complainants, during the same period, were citizens of Illinois.

The State court approved the bond and ordered the cause to be certified to the Federal court, with all the papers pertaining thereto.

In the Circuit Court the complainants entered a motion to remand the cause to the State court, which was overruled. Kernochan answered to the merits, and to that answer a general replication was filed. Upon final hearing, the injunction

granted by the State court was dissolved and the bill dismissed. The township appealed.

Preliminary to any consideration of the questions involving the validity of the bonds, as obligations of the township, it is proper that we should notice, briefly, some remarks made by counsel for the appellant, in reference as well to the proceedings in the State court after the appearance of Kernochan, as to the removal of the suit into the Federal court.

We perceive nothing irregular or erroneous in the action of the State court, whereby the cause was redocketed and the decree opened. By the statutes of the State, when a final decree is entered against a defendant who has not been summoned, or served with a copy of the bill, or received the notice required to be sent to him by mail, and such person, his heirs, devisees, executors, administrators, or other legal representatives, as the case may require, shall, within one year after notice in writing is given him of such decree, or, in the absence of such notice, within three years after such decree, appear in open court and petition to be heard touching the matters of such decree, and shall pay such costs as the court shall deem reasonable in that behalf, " the person so petitioning may appear and answer the complainant's bill; and thereupon such proceedings shall be had as if the defendants had appeared in due season and no decree had been made. And if it shall appear upon the hearing that such decree ought not to have been made against such defendant, the same may be set aside, altered, or amended, as shall appear just.; otherwise, the same shall be ordered to stand confirmed against said defendant." Hurd's Stat. Ill., 1880, p. 189, sect. 19. Kernochan appeared within one year after the decree had been passed. He was, therefore, entitled, according to any reasonable construction of the statute, to be heard touching the matters of the decree, as if no decree had been made. When the order was made opening the decree, he acquired a position in which he could take any step that might have been taken had he appeared in due season in obedience to a summons. The court was at liberty to proceed as if no decree had been made against him. He could have demurred, pleaded, or answered, or, the suit being removable into the Circuit Court of the United States, have filed a

petition and bond as required by law in such cases. The contention of counsel for appellants is, in effect, that, until Kernochan answered the bill, the State court was without jurisdiction to proceed as if he had " appeared in due season and no decree had been made." But such a construction of the statute is too technical and is scarcely admissible where the party appearing, and who has been proceeded against by publication only, is a citizen of another State, entitled under the Constitution and laws of the United States to remove the cause from the State court. The utmost which could be claimed in such cases (and we do not say that such a claim could be sustained) is, that the State court might, in its discretion, decline to open the decree, or to hear the defendant, unless he presented an answer to the bill. In this case, the motion of Kernochan to redocket the cause and open the decree was granted, without requiring him to file an answer, disclosing his defence to the suit. We are not prepared to say that the State court erred in its ruling. We should, under the circumstances, assume that the State court correctly interpreted the local statute. If, therefore, the suit was removable, the Federal court, upon its removal, and, after the pleadings were made up, and proofs taken upon the issues made by Kernochan, had the power to set aside, alter, or amend the decree as might be just, or adjudge that it stand confirmed as entered in the State court. Upon his appearance in the State court the suit became, as to him, for all practical purposes, a new suit, to be conducted, however, subject to the authority of the court to confirm the former, instead of entering a new, decree.

We do not doubt that the suit was one which the defendant was entitled, under the act of March 3, 1875, c. 137, to remove from the State court. Disregarding, as we may do, the particular position, whether as complainants or defendants, assigned to the parties by the draughtsman of the bill, it is apparent that the sole matter in dispute is the liability of the township upon the bonds; that upon one side of that dispute are all of the State, county, and township officers and taxpayers, who are made parties, while upon the other is Kernochan, the owner of the bonds whose validity is questioned by this suit. He alone, of all the parties, is, in a legal sense, inter-

ested in the enforcement of liability upon the township.   It is, therefore, a suit in which there is a single controversy, embracing the whole suit, between citizens of different States, one side of which is represented alone by Kernochan, a citizen of Massachusetts, and the other by citizens of Illinois.   *Removal Cases*, 100 U. S. 457.

But it is contended that the petition of Kernochan, for the removal of the suit, was not filed within the time prescribed by the act, that is, at the term at which the cause could be first tried.   The argument is, that Kernochan, although not advised, in any legal mode, of the pendency of the suit, was at liberty to appear therein before the decree was entered, and, consequently, that he did not seek its removal at or before the term at which the cause could have been first tried; that his appearance, and filing his petition praying to be heard touching the matters of the decree, have relation to the time when he *should* have appeared in court, *had* he been duly summoned. The bare statement of this proposition suggests its refutation. When the defendant would have been summoned had he been within the local jurisdiction of the State court, we are not informed; and, consequently, it is difficult to ascertain, upon the theory of appellant's counsel, when he should have appeared in court.   It is sufficient to say, that the defendant, within the period fixed by the statute, appeared and secured the opening of the decree.   The first term thereafter, at which the cause could properly have been tried, upon the merits, as to him, was the term at which, within the meaning of the act, he should have filed his petition for removal.   And it was so filed.

We come now to the consideration of questions involving the merits of the cause.

We have seen that the bonds recite that they were issued in pursuance as well of the authority conferred by the act of Feb. 25, 1867, incorporating the Illinois Southeastern Railway Company, and the act of Feb. 24, 1869, amendatory thereof, as of an election of the legal voters of the township, held on the tenth day of November, 1868.

The first of those acts conferred authority upon townships to donate to the railway company any amount not exceeding

$30,000. That authority was not, however, to be exercised until after a proposition by the railroad company to the township, nor unless the donation was sanctioned by a majority of legal votes, cast at an election duly called and held to consider the question of donation, upon the terms proposed. It appears, from the record, that the company made to the township a proposition which contemplated a donation of $20,000, payable in three instalments, to be raised by a special tax, to be assessed and collected in 1869, 1870, and 1871; and which also bound the company to accept township bonds in lieu of the special tax, in the event legislation could be obtained giving authority to issue them. An election was held, on the day stated in the bonds, and the donation, upon the terms set forth in the company's proposition, was approved by a vote of three hundred, out of a total vote of three hundred and forty-two.

The fifth section of the amendatory act of Feb. 24, 1869, is in these words: —

" And whereas, certain townships in Wayne and Clay Counties have voted donations to said railway company, said townships are hereby authorized and empowered to issue township bonds for t's amount so donated, without submitting the proposition again to be voted upon, — said bonds to be issued in sums not less than one hundred nor more than one thousand dollars each, with interest coupons attached, drawing interest at the rate of ten per cent per annum, payable semi-annually at the county treasurer's office, in each county where such townships are located, — said bonds to be payable in five years or any time thereafter, not exceeding twenty years, at the option of the townships; and said bonds to be signed by the supervisors thereof, or by the supervisor or supervisors of the district wherein such township is located, and to be countersigned by the township clerk of the respective townships; and said bonds to be delivered, properly executed, to the president of said railway company, when the conditions are complied with as contained in election notices and propositions submitted to and voted upon by the people of said townships; and said townships shall each, by its proper corporate authorities, provide, in due time, by a levy and a collection each year of a sufficient tax on its assessed property to pay the interest on its bonds, as it accrues half-yearly, as aforesaid, and ultimately to provide for the principal of said bonds at matur-

ity : *Provided*, that said bonds shall be placed in the hands of a trustee, on the demand of said railway company as hereinafter provided : *And, also, provided*, that such townships may determine, by a vote of their electors, at any regular or special town meeting or election, whether they will issue bonds or not in payment of the donations heretofore voted to said company." Private Laws Ill., vol. iii. p. 310.

In conformity with the provisions of that act, a special town meeting of the township was duly called and held on the twentieth day of May, 1870, at which the electors present voted unanimously in favor of an issue of bonds, in payment of the donation previously voted, rather than proceed with the levy and collection of a special tax, as contemplated by the original proposition of the company. A few days thereafter, to wit, May 27, 1870, as appears from the records of the township, the bonds, amounting to $20,000, were delivered by the township officers to the Springfield and Illinois Southeastern Railway Company, a corporation which had been formed on the 3d of December, 1869, in accordance with the laws of Illinois, by the consolidation of the Illinois Southeastern Railway Company with the Pana, Springfield, and Northwestern Railway Company. The bonds were transmitted by the township supervisor to the State auditor for registration, under the provisions of the funding act in force April 16, 1869. He certified, under oath, that they had been issued under the said acts of Feb. 25, 1867, and Feb. 24, 1869, and that all the preliminary conditions required, in the act of April 16, 1869, to be performed before such registration, and to entitle them to the benefits of that act, had been, to the best of his knowledge and belief, fully complied with. It may also be stated that taxes were annually levied, collected, and applied, by the township, in payments of interest on the bonds up to the commencement of this suit in 1877.

In view of these facts it is difficult to perceive upon what just ground the township can escape liability. In the first place, the bonds were issued in pursuance of a popular vote in favor of a donation to be met by a special tax, and also of a vote, at a subsequent special election, in favor of an issue of bonds in payment of that donation. In the next place, and as

conclusive against the township, the recitals in the bonds import a compliance with all of the provisions of the acts of assembly under which they were issued. It is true that the bonds do not, in express words, refer to the special election of May 20, 1870; but since the amendatory act authorized the township, upon a vote, at a regular or special town meeting or election, to issue bonds in payment of the donation previously voted, the recital in them fairly imports that such an election was, in fact, held before they were issued.

If those acts are not repugnant to the Constitution of the State, it results that, according to repeated adjudications of this court, the township is estopped, by the recitals in the bonds, to assert that their provisions were not complied with. The Constitution of Illinois, in force when these acts were passed, declared that the corporate authorities of counties, townships, school-districts, cities, towns, and villages may be vested with power to assess and collect taxes for corporate purposes. It is the settled law of the State, as heretofore recognized by this court, that this constitutional provision was intended to define the class of persons to whom the right of taxation might be granted, and the purposes for which it might be exercised; and that the legislature could not constitutionally confer that power upon any other than corporate authorities of counties, townships, school-districts, cities, towns, and villages, or for any other than corporate purposes. *County of Livingston* v. *Darlington*, 101 U. S. 411. Our attention is called to several cases in the Supreme Court of the State, in which it has been held that the legislature could not constitutionally require a municipal corporation, without its consent, to issue bonds or incur a debt for a merely corporate purpose. Some of those cases turn upon the inquiry as to who are, in the sense of the Constitution, corporate authorities of counties, cities, towns, &c., and what are corporate purposes. A leading case is *Williams* v. *Town of Roberts* (88 Ill. 11), where the court, speaking by Chief Justice Scholfield, said that under the system of township organization existing in Illinois, the electors alone represented the corporate authority of the town, and without their consent, expressed at town meetings or town elections, no

debt for a merely local corporate purpose could be imposed upon the township.

But neither that nor any other decision by the State court cited by counsel distinctly meets the precise point now before us, or would justify us in holding (as we ought not to do except in a clear case) that the General Assembly of the State had transcended its constitutional powers. The act of Feb. 27, 1867, did not assume to impose a debt upon the township without the consent of the electors. It expressly required an election to be held, at which the legal voters could determine the question of donation for themselves. The election was held, and a donation voted to aid in the construction of a railroad. That, it must be conceded, was a corporate purpose, within the meaning of the Constitution as interpreted by the State court. But it is contended that the amendatory act authorized the township officers, without the assent of the voters, to impose a burden or create a debt wholly different from that to which the voters, at the election on the 10th of November, 1868, gave their assent. Counsel overlook or fail to give proper force to the proviso in that act authorizing the electors at a regular or special town meeting to determine whether they would issue bonds in payment of the donation previously voted to the company. And there was, as we have seen, a special town meeting, duly called for the specific purpose of determining that question, and the decision was unanimous in favor of issuing bonds to pay off the donation.

It is urged, in this connection, that the Supreme Court of the State, in the recent case of *Schaeffer* v. *Bonham* (95 id. 378), decided in 1880, has ruled that the fifth section of the amendatory act of Feb. 24, 1869, was in violation of the Constitution of the State, and that it was the duty of this court to accept that decision as conclusive. That case in many respects resembles this one, but, upon the particular point arising here, it is materially different. It was submitted upon an agreed statement of facts, from which it appears that a certain township had, in 1868, voted a donation to the Illinois Southeastern Railway Company, to be raised by special tax, under the authority conferred in the act of Feb. 25, 1867. But it did not appear, from the evidence in that case, that an election had been held,

as authorized by the fifth section of the act of Feb. 24, 1869,
to determine whether the donation should be paid by township
bonds rather than by a special tax for a limited period. We
infer from the agreed statement of facts in that case, as well as
from the remarks of the court, that no opportunity was, in fact,
given to the voters to determine the question of issuing bonds.
The court said that the charter authorizing townships to vote
donations did not contemplate, and, consequently, did not pro-
vide, for issuing bonds; that it only intended a donation to be
paid by the levy of a tax, and the payment of the money, when
thus collected, to the railroad company; that the legislature
could not confer upon the township officers, without a vote of
the people, authority to make such a radical change in the
proposition upon which the people voted, as would occur, if,
instead of a special tax, during a limited period, to meet the
donation, township interest-bearing bonds should be issued,
running from five to twenty years.

The State court, in referring to the fifth section of the act of
Feb. 24, 1869, states that it "authorizes and empowers town-
ships in Wayne and Clay Counties, that had voted donations
to the road, *without submitting the question to a vote*, to issue
bonds," &c. We are unable to concur in that construction of
the act, since that section, after authorizing townships in
Wayne and Clay Counties, which had voted donations to the
railway company, "to issue township bonds for the amount so
donated, without submitting *the proposition* [for a *donation*]
*again* to be voted upon," expressly declares that "such town-
ships may determine by a vote of their electors, at any regular
or special town meeting or election, whether they will issue
bonds or not in payment of the donations heretofore voted to
said company." The purpose of the fifth section was to dis-
pense, as to certain townships, with a second vote upon the
general question of donation, and to confer authority to issue
township bonds in payment of such donation, when, and only
when, the electors so voted at a regular or special town meeting
or election. In *Schaeffer* v. *Bonham* it did not appear that the
voters were consulted as to whether bonds should be substituted
in lieu of the special tax previously voted. The parties there
sought the opinion of the court upon an agreed statement of

facts, which, in effect, conceded that no such election was held. Here it is shown that the bonds in suit were issued in pursuance of the vote of the electors at a special town meeting called to determine the question whether the donation previously voted should be paid in that mode. It is clear that *Schaeffer* v. *Bonham* proceeds upon the ground, in part, that the bonds there in suit were issued in payment of the donation, without any submission of the question to the voters.

In another portion of its opinion, after stating that the assessment of taxes to pay off the donation was the imposition of a debt upon the township, the State court said: "Had the township voted to incur a debt, and the bonds had been issued by a person named by the General Assembly, different from the corporate authorities, then payment of interest and acquiescence for such a' length of time might have operated as an estoppel. In such a case, the vote to create the debt, if authorized by law and had in pursuance of law, would have been the essential act to create the debt, and the mere signing and delivering the evidence of the debt would have been valid if done by a person specified by the General Assembly, whether named before or after the vote was had. But such is not the case here. No debt was voted, and the legislature was powerless to authorize any but the corporate authorities to create a debt." p. 381. If, as held by the State court, the issuing of bonds, in payment of the donation previously voted, was incurring a debt, and if such a debt could not be incurred without a direct vote of the electors, it is sufficient to say that such a vote was had in reference to the bonds here in suit.

For the reasons stated we are of opinion that the acts of Feb. 25, 1867, and Feb. 24, 1869, are not in violation of the Constitution of the State; and in so holding we do not, we think, come in conflict with any decision of the State court in which the precise question here presented has been passed upon.

It remains for us to consider whether the township can avoid liability upon the bonds by reason of the fact that they were delivered to the Springfield and Illinois Southeastern Railway Company, the donation having been originally voted to the Illinois Southeastern Railway Company.

We are of opinion that there is nothing of substance in this objection. The act incorporating the Illinois Southeastern Railway Company, the act amendatory thereof, and the act in relation to the Pana, Springfield, and Northwestern Railway Company (even if the general statutes of the State were not sufficient for the purpose), fully authorized the consolidation between those two companies, and upon such consolidation the new company succeeded to all the rights, franchises, and powers of the constituent companies. The power in the township to make a donation to aid in the construction of the Illinois Southeastern railway was also a privilege of the latter corporation, and that privilege, upon the consolidation, passed to the new company. The donation was voted before the consolidation took effect, and since the consolidated or new company did not propose to apply such donation to purposes materially different from those for which the people voted it in 1868, its right to receive the donation, at least when the township assented, cannot be doubted. The records of the township show that the bonds were directed to be issued and delivered to the new company, and it will not, under the circumstances, be allowed to say, as against a *bona fide* purchaser for value, that the bonds are invalid. There is, consequently, no pretext for saying that a burden was imposed upon the people to which they had never given their consent in the mode prescribed by law.

Other questions are discussed, but we do not deem it necessary to refer to them.

*Decree affirmed.*